21CA1463 Peo in Interest of Rubit 11-24-2021 COLORADO COURT OF APPEALS Court of Appeals No. 21CA1463 Pueblo County District Court No. 21MH87 Honorable Timothy O’Shea, Judge The People of the State of Colorado, Petitioner-Appellee, In the Interest of Preston D. Rubit, Respondent-Appellant. ORDER AFFIRMED Division VI Opinion by JUDGE WELLING Fox and Johnson, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced November 24, 2021 Cynthia Mitchell, County Attorney, Kate H. Shafer, Special Assistant County Attorney, Pueblo, Colorado, for Petitioner-Appellee Nathan Law, P.C., Mary E. Nathan, Fountain, Colorado, for Respondent-
Appellant 
1 ¶ 1 Respondent, Preston D. Rubit, appeals the trial court’s order authorizing the involuntary administration of two medications. We affirm. I. Background ¶ 2 After being found incompetent to proceed in two criminal cases, Rubit was committed to the Colorado Mental Health Institute at Pueblo (CMHIP). On August 24, 2021, the People petitioned the trial court to authorize the involuntary administration of medication to treat Rubit’s mental illness. Specifically, the People sought authorization to administer two antipsychotic medications — namely, Zyprexa/Olanzapine and Abilify — and corresponding lab work to monitor the efficacy and side effects of the medications. ¶ 3 The trial court held an evidentiary hearing at which Rubit and his treating psychiatrist, Dr. Lennart Abel, testified. Dr. Abel testified that Rubit suffered from psychosis not otherwise specified, which is expressed in delusional beliefs. Dr. Abel opined that Rubit does not have any insight into his mental illness and that he needs medication to treat his mental illness. He also testified that he has been effectively treating Rubit by administering Abilify pursuant to a previous court order, and that Rubit could take Zyprexa but 
2 chooses Abilify to avoid problems with effectively managing his diabetes. ¶ 4 Dr. Abel testified that he intends to continue to treat Rubit with Abilify orally and to eventually also administer a monthly intramuscular injection of Abilify. Dr. Abel stated that Rubit needs to have the Zyprexa as a backup in the event Rubit refuses an oral dose of Abilify, which would then allow the healthcare providers to administer an intramuscular dose of Zyprexa. ¶ 5 After the hearing, the court found the following facts were proved by clear and convincing evidence: • Without the medications requested, it’s unlikely that Rubit will be restored to competency and the State will not be able to resolve the criminal charges against him. • The medications requested are unlikely to have side effects that will interfere significantly with Rubit’s ability to assist his counsel in conducting a trial defense. • The medications requested will not cause Rubit’s trial to be unfair. 
3 • The administration of the medications involuntarily is necessary to further the interests of the State in resolving Rubit’s criminal charges. • There is no less intrusive treatment that will allow Rubit to be restored to competency. • The medications requested are medically appropriate. Based on these findings, the court granted the People’s petition and entered an order authorizing the involuntary administration of the two requested medications. ¶ 6 Rubit appeals, arguing that the People didn’t present sufficient evidence to support the court’s order. II. Analysis A. Standard of Review ¶ 7 We must determine whether the evidence, when viewed as a whole and in the light most favorable to the prevailing party, is sufficient to support the order. People in Interest of R.K.L., 2016 COA 84, ¶ 13. We review the trial court’s legal conclusions de novo, but we defer to the court’s findings of fact if record evidence supports them. People in Interest of Strodtman, 293 P.3d 123, 131 (Colo. App. 2011). “[T]he credibility of witnesses, the sufficiency, 
4 probative effect and weight of the evidence, and the inferences and conclusions to be drawn therefrom are all within the province of the trial court . . . .” People in Interest of C.A.K., 652 P.2d 603, 613 (Colo. 1982). Testimony from a treating physician can be sufficient to support the trial court’s findings in an involuntary medication order. People v. Pflugbeil, 834 P.2d 843, 847 (Colo. App. 1992). B. The Law of Competency Restoration ¶ 8 The United States Supreme Court has established a four-part test for determining when a state may involuntarily administer antipsychotic medication to restore a defendant’s competency in a criminal proceeding. See Sell v. United States, 539 U.S.166, 180-
81 (2003); see also People in Interest of R.F., 2019 COA 110, ¶ 21. ¶ 9 “First, a court must find that important governmental interests are at stake. The Government’s interest in bringing to trial an individual accused of a serious crime is important.” Sell, 539 U.S. at 180. ¶ 10 Second, involuntary medication must significantly further those interests. Id. at 181. This means that “administration of the drugs is substantially likely to render the defendant competent to stand trial” and “is substantially unlikely to have side effects that 
5 will interfere significantly with the defendant’s ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.” Id. ¶ 11 Third, the medication must be necessary to further those interests. That is, “[t]he court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results.” Id. Under this element, “the court must consider less intrusive means for administering the drugs,” such as “a court order to the defendant backed by the contempt power.” Id. ¶ 12 Fourth, the medication must be “medically appropriate, i.e., in the patient’s best medical interest in light of his medical condition.” Id. ¶ 13 The state must prove each element by clear and convincing evidence. R.F., ¶ 16. C. Sufficient Evidence Supported the Court’s Findings ¶ 14 Rubit argues that Sell’s second, third, and fourth elements were not proved by sufficient evidence. We disagree. 
6 1. Element Two: Involuntary Medication Must Significantly Further Important Governmental Interests ¶ 15 With respect to the second element, the court found that “without the medications request[ed], it is unlikely [Rubit will] be restored to competency and the People of the State of Colorado will not be able to resolve the criminal charges pending against him.” The court observed that the medications “are unlikely to have side effects that will interfere significantly with [Rubit’s] ability to assist counsel at trial.” ¶ 16 Dr. Abel’s affidavit and testimony support these findings. He stated in his affidavit that Zyprexa and Abilify are “likely to render [Rubit] competent” and “the medications are unlikely to have side effects that will interfere significantly with [Rubit’s] ability to assist counsel in his criminal case.” Dr. Abel testified that while on Abilify, Rubit is “logical and coherent,” and that when Rubit had taken Zyprexa before, he became competent to proceed. ¶ 17 Rubit gained 110 pounds the last time he was on Zyprexa, and he argues that the risk of further weight gain, heart disease, worsened diabetes, and possibly death loom large and have the potential to make him too ill to assist his counsel. Dr. Abel, 
7 however, testified that “[Rubit] has diabetes, but his diabetes has been managed with Abilify,” and that when Rubit was on Zyprexa and had his blood levels checked “they [were] reasonable.” Based on Dr. Abel’s testimony, the trial court’s finding that the medications are unlikely to have side effects that will interfere significantly with Rubit’s ability to assist counsel in his criminal case is adequately supported by the record. 2. Element Three: Any Alternative, Less Intrusive Treatments are Unlikely to Achieve Substantially the Same Results ¶ 18 With respect to the third element, the trial court found that the medications were necessary. Dr. Abel’s testimony supports this finding. He stated that Rubit “would like to have therapy, but therapy alone will not treat the formal thought disorder.” ¶ 19 Rubit argues that the court should have considered Abilify on its own (without Zyprexa as a backup) as the less intrusive method. Rubit argues that he has taken and will continue to take Abilify voluntarily, even without a court order in place. Additionally, Rubit argues that the “just-in-case” rationale for ordering Zyprexa as a backup is fatal to the third Sell element. We disagree. 
8 ¶ 20 The record supports the court’s rejection of this alternative. This is not the first order to involuntarily medicate Rubit. Prior to a court entering an earlier involuntary medication order (which is now expired), Rubit was refusing both Zyprexa and Abilify. Additionally, Dr. Abel has attempted to explain the benefits and side effects of each medication to Rubit, but Rubit has refused to talk with him. Instead, according to Dr. Abel, Rubit has “talked with his nurse practitioner, and he has indicated to his nurse practitioner that he takes the Abilify voluntarily, but he would not continue to take it if there was not a court order forcing him to take Zyprexa if he refused to take [Abilify].” ¶ 21 Dr. Abel’s testimony indicates that Rubit won’t continue to take Abilify unless Zyprexa is ordered as a backup in the event that Rubit refuses his Abilify. Based on these circumstances, the trial court didn’t err by rejecting the Abilify-only alternative because it was not a viable less intrusive means for medicating Rubit. See Sell, 539 U.S. at 181. 3. Element Four: The Medication Must Be Medically Appropriate ¶ 22 With respect to the fourth element, the trial court found that the medications “are medically appropriate for the treatment of 
9 [Rubit’s] mental disorder.” Dr. Abel testified that Rubit has unspecified psychosis and that the requested medications would likely treat his condition and restore his competency. This supports the trial court’s conclusion that the medications are medically appropriate and that the medications are in Rubit’s best interest. ¶ 23 The court observed that Rubit has diabetes and that Zyprexa could cause weight gain, but the court relied on Dr. Abel’s testimony that the CMHIP healthcare providers would monitor Rubit’s condition through close observation and blood work. Dr. Abel testified further that if Rubit’s diabetes worsened, his treating doctors would add additional medication to treat his diabetes. Dr. Abel maintained that the medications were medically appropriate even considering Rubit’s diabetes. ¶ 24 Therefore, we reject Rubit’s contention that the trial court erred by finding that the medications are medically appropriate. III. Conclusion ¶ 25 The order is affirmed. JUDGE FOX and JUDGE JOHNSON concur.